**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PABLOS CAFÉ AND BAR LLC, | ) | |
| an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No.: 24-cv-01770 |
| THE VILLAGE OF DOLTON, a municipal | ) | |
| corporation, TIFFANY A. HENYARD, | ) | |
| in her capacity as Mayor of the Village of Dolton, | ) | Hon. Judge Jeffrey I. Cummings |
| and LEWIS LACEY in his capacity as the Deputy | ) | |
| Chief of Police for the Village of Dolton, | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT FOR DAMAGES**

Plaintiff Pablos Café and Bar LLC, an Illinois limited liability corporation, by and through

its attorneys, Fahner Rosenberg PLLC d/b/a RKF Global PLLC, brings this Second Amended

Complaint for Damages and Injunctive relief against Defendants Village of Dolton, a municipal

corporation, Tiffany A. Henyard in her capacity as Mayor of the Village of Dolton, and Lewis

Lacey in his capacity as the Deputy Chief of Police for the Village of Dolton, and states as follows:

**JURY TRIAL**

1.      Plaintiff requests a trial by jury on all issues properly triable.

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§

1331 and 1343.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because

Plaintiff and Defendants either reside in this district or have their principal place of business in this

district, and all events giving rise to Plaintiff's claims occurred within this district.

1

## PARTIES

4.      Pablos Café and Bar LLC, d/b/a Pablo's Café and Bar, ("Plaintiff" or "Pablo's") is an Illinois limited liability company that operates a bar and restaurant at its principal place of business located at 1115 Sibley Blvd, Dolton, Illinois 60419 (the "Property"). Plaintiff is a duly licensed bar that operates out of the Property.

5.      Defendant Village of Dolton is a home rule unit of local government listing a principal place of business of 14122 Martin Luther King Drive, Dolton, Illinois 60419 (hereinafter the "Village" or "Dolton").

6.      Defendant Tiffany A. Henyard was, at all relevant times, the Mayor of the Village and the Local Liquor Control Commissioner (hereinafter "Henyard").

7.      The Village of Dolton Police Department ("DPD") is the local police department for the Village of Dolton operating under the jurisdiction of the same.

8.      Defendant Lewis Lacey was, at all relevant times, the Deputy Chief of Police of the DPD (hereinafter referred to as "Lacey").

## OTHER ENTITIES

9.      The Board of Trustees for the Village (the "Village Board") is a governing body responsible for making decisions and setting policies at the local level regarding budgeting, local ordinances, licensing, land use planning, and overall community development, among others.

10.     FOX 32 Chicago ("FOX Chicago") is the City of Chicago's local 'Fox News' station reporting on relevant issues and happenings in the greater Chicagoland area.

## FACTUAL ALLEGATIONS

11.     At all relevant times, Henyard, as the Mayor of Dolton served as the Village's final policymaker regarding issuance, renewal, and revocation of liquor licenses under Village Code §§

3-3-7 and 3-3-17. Henyard's decisions in these matters constitute official policy of the Village.

12. Plaintiff began operating as a bar and restaurant on March 5, 2020.

13. During the relevant period, Plaintiff had a Class D liquor license (Exp: April 30, 2023) (the "Liquor License") for the Property which allows Plaintiff to serve alcohol at the Property.

14. During the relevant period, Plaintiff also had a Village business license which was also set to expire on April 30, 2023 (the "Business License") (Business License and Liquor License collectively referred to as the "Licenses"). Plaintiff also has a state liquor license ("State License" (Exp: February 28, 2025)) and a state gaming license ("Gaming License" (Exp: December 2024).)

15. Dolton is a home rule municipality within Cook County, Illinois, with local jurisdiction of issuing or renewing licenses for establishments within the Village. *See* 235 ILCS 5/4-1.

16. Since the filing of Plaintiff's initial complaint, Plaintiff has renewed or taken steps to renew any licenses that may have expired when Plaintiff's initial complaint was filed.

17. Section 3-3-7 of the Village Code states that a Class D license (the "Class D License") "[s]hall authorize the sale at retail and consumption of alcoholic liquor on the specified premises, only as an incident to a business, other than the sale of alcoholic liquor which is regularly licensed and operated as a business in chief or principal business of the owner."

18. Section 3-3-7 of the Village Code states the total number of Class D Licenses "shall not exceed" eleven (11).

19. On April 15, 2023, Plaintiff filed and attempted to pay for the renewal application for the Licenses with the Village, in that the Licenses were set to expire April 30, 2023.

20. The Village accepted the application.

21.     Consistent with historical practice and as affirmed through verbal communications with agents of the Village, Plaintiff was allowed to continue to carry on its business pending the issuance of the Licenses.

22.     In May 2023, one of Pablo's managers, George Mseeh, placed several telephone calls to the Village to inquire about the status of the Licenses. On several occasions, representatives for the Village did not answer the call. On other occasions, representatives for the Village stated that "[Plaintiff's] license is in process" or "pending," or stated that "[the Village] will call you when it's ready."

23.     Mr. Mseeh was never told that there was any issue with the applications for the Licenses or that the Village was aware of anything that would impact Plaintiff's eligibility for renewal.

24.     Upon information and belief, Henyard directed those Village employees who spoke with Mr. Mseeh (or any Village license holders for that matter) to falsely state that the license applications were "in process" or "pending" even though the Village had no intention of issuing those licenses at the times those statements were made.

25.     Near the end of June 2023, following yet another inquiry from Mr. Mseeh, a Village representative told Mr. Mseeh to "call the Village administrator, Keith Freeman" ("Freeman") or the Village's attorneys at the Del Galdo Law Group, LLC ("Del Galdo").

26.     In addition, Del Galdo's principal, Michael Del Galdo, stated in Village Board Meetings that business owners could call Del Galdo about their license renewals.

27.     Mr. Mseeh then telephoned Freeman on numerous occasions. Freeman, however, did not answer or return any of those calls.

28.     Mr. Mseeh also telephoned Del Galdo on numerous occasions but was told that the

law firm has nothing to do with the issuance of the Licenses.

29.     On July 5, 2023, Village inspector Kim Alston ("Alston") telephoned Mr. Mseeh and stated, "you need to clear the bar, the police are on the way to shut you down for not having a license."

30.     Twenty (20) minutes after Mr. Mseeh received Alston's phone call, DPD Officer Jeremiah Lee ("Lee") and 4 to 6 other DPD Officers arrived at the Property. Lee told Mr. Mseeh, "We are shutting you down for not having a local liquor license."

31.     Although Plaintiff had filed its renewal applications for its Licenses, the Village was shutting Plaintiff down based on the Village's failure to renew Plaintiff's Liquor License and Business License.

32.     Lee further stated, "Go to the Village Hall tomorrow and talk to them."

33.     The DPD Officers who arrived at the Property on July 5, 2023 did not give Plaintiff any documents, official or otherwise, regarding the closure; nor did the DPD Officers affix any sticker or closure notice on the front door of the Property, or elsewhere.

34.     Prior to July 5, 2023, Plaintiff had not been given notice that it might be shut down for the reason that its Liquor License had not been renewed; nor had Plaintiff received any updates from the Village concerning the status of its Licenses.

35.     From July 6, 2023, onward, Mr. Mseeh and his wife, Mrs. Nadia Mseeh, went to the Village Hall every day to speak with any Village employee who could or would assist Plaintiff with its Licenses or explain the closure of the Property.

36.     At no time was Mr. Mseeh or Mrs. Mseeh given any answers about the renewal or status of Plaintiff's application for renewal of its Licenses, or any information concerning the forced closure of the Property by the DPD.

37.     After the July 5, 2023, closure, Plaintiff sought and filed an appeal of the closure with the Illinois Liquor Control Commission (the "ILCC").

38.     Plaintiff was closed by the DPD from July 5, 2023, through October 3, 2023 due to the Village refusing to act on Plaintiff's renewal applications.

39.     On October 3, 2023, Robert Collins, former DPD chief of police, sent an email to the DPD stating, "[p]lease be advised that Pablo's and Angels will be allowed to operated (sic) while they are waiting for their hearing." (October 3, 2023 email attached as Exhibit A).

40.     Instead of moving to revoke Plaintiff's Licenses (which would have entitled Plaintiff to a hearing), the Village instead refused or otherwise failed to act on Plaintiff's renewal applications and used that refusal to act as the basis for the closure.

41.     In July 2023, Mr.  Mseeh attended the monthly Village Board Meeting (the "July Meeting").

42.     Henyard was present at the July Meeting.

43.     At the July Meeting, Mr. Mseeh asked Henyard about the status of Plaintiff's Licenses.

44.     Henyard responded that the Village would issue the Licenses but that they were "pending" and would be issued soon once the Village's internal process was completed.

45.     At all relevant times, Henyard determined when or if a business or liquor license application would be approved or would remain "pending."

46.     At all relevant times, all Village employees knew that they were required to wait for Henyard's approval on whether to grant a license renewal application or issue a license (either liquor license or business license applications) as Henyard acted as the de facto final decisionmaker as to all license renewal applications and whether those applications would be granted and licenses

6

would issue, or would indefinitely remain indefinitely "pending."

47.     In August 2023, Mr. Mseeh attended the monthly Village Board Meeting (the "August Meeting").

48.     Henyard was present at the August Meeting.

49.     At the August Meeting, Mr. Mseeh asked Henyard about the status of Plaintiff's Licenses.

50.     Henyard again responded that the Village would issue the Licenses but that they were "pending" and would be issued soon, once the Village's internal process was completed.

51.     Upon information and belief, the Village did not have an internal approval process for license renewal applications and Village employees would defer entirely to Henyard as to whether a license renewal application would be granted and licenses would issue, or would remain indefinitely "pending."

52.     In September 2023, Mr. Mseeh attended the monthly Village Board Meeting (the "September Meeting").

53.     Henyard was present at the September Meeting.

54.     At the September Meeting, Mr. Mseeh asked Henyard about the status of Plaintiff's Licenses.

55.     Henyard again responded that the Village would issue the Licenses but that they were "pending" and would be issued soon once the Village's internal process was completed.

56.     As of September 2023, the Village had not undertaken any internal approval process for Plaintiff's Licenses as Henyard had already determined the renewal applications would remain indefinitely "pending."

57.     In October 2023, Mr. Mseeh attended the monthly Village Board Meeting (the

"October Meeting").

58.     Henyard was present at the October Meeting.

59.     At the October Meeting, Mr. Mseeh asked Henyard about the status of Plaintiff's Licenses.

60.     Henyard again responded that the Village would issue the Licenses but that they were "pending" and would be issued soon, once the Village's internal process was completed.

61.     From April 30, 2023, to November 2, 2023, Plaintiff's Licenses were not renewed by the Village, Plaintiff was not given any explanation for the delay in renewing the Licenses, and Plaintiff was not given an explanation about why DPD officers closed the Property "for not having a local liquor license."

62.     From April 30, 2023, to November 2, 2023, Plaintiff's Licenses were not renewed by the Village as Henyard had not authorized their approval.

63.     During that time, and upon information and belief, all Village employees were instructed not to grant any business license or liquor license renewal applications without Henyard's approval.

64.     The Village had an express practice of not acting on any business license or liquor license renewal applications without Henyard's approval, and the Village would cause those applications to remain "pending" indefinitely.

65.     On November 2, 2023, Alston served Plaintiff at the Property with a packet of documents which was received by an employee of Plaintiff.

66.     Plaintiff was served with a "Certificate of Receipt" (the "Certificate") which "acknowledged receipt of the attached Notice of Hearing on Revocation/Nonrenewal of Business License and Notice of Hearing on Revocation/Nonrenewal of Liquor License…" (Certificate

attached as Exhibit B).

67.     The Certificate included two case numbers, Case No. 2023 BL 10 and 2023 LL 10.

68.     The caption of the Certificate states, "In Re Proceedings to Revoke and/or Non-Renew Village of Dolton Business License and Liquor License."

69.     Attached to the Certificate was a Notice of Hearing on Revocation and/or Non-Renewal of Business License for Case No. 2023 BL 10 captioned *In Re Proceedings to Revoke and/or Non-Renew Village of Dolton Business License Issued to Pablo's* (sic) *Café and Bar, LLC.* (Attached as Exhibit C).

70.     With the exception of the case numbers and signatory, the charge for 2023 LL 10 was identical to the charge for 2023 BL 10 (charge for both cases collectively referred to as the "Charge").

71.     The Charge alleged thirty-one (31) incidents that the Village complained warranted the revocation and or non/renewal of Plaintiff's Licenses.

72.     The Charge is *per se* unconstitutional in that the allegations contained within it are purposefully exaggerated and not related to the operation of the Property.

73.     Allegations on the Charge include, but are not limited to, the following:

On or about March 6, 2023, a woman complained to Village police that she was being threatened by subjects at the [Property]. She was in the parking lot and said subjects threatened to shoot her. The call was determined to be unfounded.

(*See* Exhibit A, ¶ 8.)

On or about the same day January 28, 2023, officers also received reports of shots being fired at the [Property]. Upon arrival, a witness informed police a car drove past and was shooting in the area.

(*Id.*, ¶ 11.)

On or about January 15, 2023, a female called the police asking for assistance because she forgot where she parked. She sounded highly intoxicated. A friend

eventually found her and the vehicle.

(*Id*., ¶ 14.)

On or about December 8, 2022, the Village was notified that an employee of [Plaintiff] was having an anxiety attack in her vehicle.

(*Id*., ¶ 17.)

Lastly, on or about November 1, 2022, the Village performed a wellness check for a woman who had a seizure. She refused medical attention.

(*Id*., ¶ 24.)

On or about August 30, 2022, a woman alleged that her child's father was inside the [Property] with their seven (7) year old daughter. The complainant further reported that her child's father was harassing her and trying to take her keys.

(*Id*., ¶ 28.)

On or about the same day, June 18, 2022, a woman complained that a security guard at the Premises threw her to the ground and feared for her life. This woman was determined to be an unruly patron and had been drinking.

(*Id*., ¶ 30.)

On or about May 10, 2022, a noise complaint was made. Vehicles were playing music loudly in the alley of the [Property]. Once notified, the subject agreed to turn the music down.

(*Id*., ¶ 33.)

74.    The Village has a finite number of 11 Class D Liquor Licenses. *See* Village Code Section 3-3-7.

75.    Upon information and belief, the Village's liquor licenses have all been issued and, as such, no new Class D Licenses can be issued unless an existing Class D License expires, is non-renewed, or is revoked.

76.    Plaintiff, despite requests from Henyard and/or Henyard's Office did not donate to Henyard in the most recent Village mayoral election.

77.     Upon information and belief, Henyard has a pattern and practice of non-renewing or moving to revoke Business Licenses and/or Liquor Licenses of her political rivals, those she views as disloyal, and/or those who did not donate to her mayoral campaign or foundation.

78.     The Village has a pattern and practice of causing licenses to remain "pending" without Henyard's approval, so that Henyard could misuse her office to punish her political rivals, those she views as disloyal, and/or those who did not donate to her mayoral campaign or foundation.

79.     Upon information and belief, Henyard was seeking to revoke Plaintiff's Liquor License so that Henyard could issue that license to her associate Kamal Woods ("Woods").

80.     Upon information and belief, Woods is or was developing a commercial real estate project that would require a Class D Liquor License.

81.     Upon information and belief, Henyard's cousin is or was developing a commercial real estate project that would require a Class D Liquor License.

82.     Upon information and belief, Henyard sought to non-renew and/or revoke Plaintiff's Liquor License, close Plaintiff down, and cause Plaintiff's renewal applications to remain "pending" for one of three (3) reasons, all of which may be true: 1) so Henyard could issue that license to an entity owned or controlled by Woods and/or her cousin; 2) in retaliation for Plaintiff's refusal to donate to Henyard's mayoral campaign; and/or 3) so that Henyard could somehow profit from issuance one of the Village's finite number of Class D Liquor Licenses.

83.     Regardless of Henyard's motive, Henyard used the Charge to non-renew and/or revoke Plaintiff's Licenses without first delegating her authority as the Local Liquor Commissioner to anyone else.

84.     The Village intentionally exaggerated the Charge so that Henyard could use the

11

recommendation regarding Plaintiff's Licenses to use (or misuse) her authority as the Local Liquor Commissioner to non-renew or revoke Plaintiff's Liquor License.

85.     Attorney Michael Kasper ("Kasper") was appointed as the hearing officer for the Proceeding.

86.     Upon information and belief, Henyard appointed Kasper as the hearing officer.

87.     Del Galdo acted as the attorney prosecuting the Charge on behalf of the Village.

88.     Kasper has previously represented Henyard personally and has acted as lead counsel in the matter of *Henyard v. Municipal Officers of Village of Dolton*, 2022 IL App (1st) 220898, ¶ 1.

89.     Kasper did not disclose his prior representation of Henyard to Plaintiff, and Plaintiff filed a motion to disqualify Kasper as hearing officer as soon as it discovered the conflict.

90.     Kasper denied Plaintiff's motion to disqualify on January 8, 2024.

91.     Kasper also has a co-counsel relationship in other matters with Del Galdo which Kasper also failed to disclose to Plaintiff.

92.     Dal Galdo acted as the town attorney for the Town of Cicero at the same time Kasper acted as Ethics Officer for the Town of Cicero.

93.     Kasper and Del Galdo acted as co-counsel on, including but not limited to, *La Playita Cicero, Inc. v. Town of Cicero*, No. 11-cv-1702, No. 11-cv-5561; *Topinka v. Kimme*, No. 1-16-1000; *Corbin v. Schroeder*, 2021 IL 127052; and *Gonzales v. Madigan*, Case No. 16 C 7915.

94.     Upon information and belief, Kasper and Del Galdo were both hired in 2020 by Elk Grove Village regarding an anonymous billboard.

95.     The Village had a pattern or practice of stacking the Village license renewal process employees and Village license disciplinary enforcement employees or counsel with Henyard

loyalists who would defer to her directive and agenda without question or protest.

96.     Upon information and belief, and during the relevant time period, the Village license disciplinary process was predetermined based on Henyard's directive.

97.     A hearing was held on the Charge on January 26, 2020 (the "Hearing") to revoke or non-renew Plaintiff's Business License and Liquor License.

98.     Plaintiff only received a Hearing transcript after filing its initial Complaint.

99.     At the Hearing, the following DPD Officers were called to testify in support of the Charge:

    a.  Jason Mathus ("Mathus") testified "that he responded to a call to the [Plaintiff's] premises 'several times a month' and that such incidents were 'for some type of fight, shots fired, whatever it is." (*See* Exhibit D, p. 6);

    b.  Kennelle Clark ("Clark") testified at the Hearing but her testimony was not addressed in the Revocation Order (defined below). (*Id*. at pp. 4-12);

    c.  Enrique Herrera ("Herrera") testified he was at the Property more than 10 times in 2023 and responded to incidents that took place in the parking lot (*Id*. at p. 6);

    d.  Tyjuan Malone ("Malone") testified DPD is called to the Property "10 to 12" times per month and that he was at the Property "8 to 20" times per month (*Id*. at p. 7);

    e.  Michael Gilhooly ("Gilhooly") testified at the Hearing but his testimony was not discussed in the Revocation Order. (*Id*. at pp. 4-12);

    f.  Lee testified he was called to the Property "five times" a month "and 'sometimes' more frequently."; (*Id*. at p. 7) and,

g.   Vincent Nunez ("Nunez") testified "that he had been called out to [the Property] between 120 and 150 times during the calendar year of 2023." (*Id*. at p. 7);

100.   Mathus, Herrera, Malone, Lee, and Nunez (collectively the "Testifying Officers") were asked almost exclusively leading questions by Del Galdo and their answers were limited to "yes" or general statements and conclusions without any foundational support.

101.   Gilhooly and Clark were asked a similar style of leading questions by Del Galdo.

102.   Neither Del Galdo nor the Testifying Officers offered a single document into evidence in support of the Testifying Officers' testimony.

103.   Upon information and belief, the Testifying Officers did not testify as to any specific dates, times, names of complaining parties, or any other relevant foundational information that would support their testimony.

104.   The majority of what the Testifying Officers testified to occurred in the parking lot of the Property, which is located in a multi-business commercial strip mall, or the general vicinity and street in front of or behind the Property.

105.   Upon information and belief, Clark testified in a manner that was completely inconsistent with the Testifying Officers, stating that she either did not remember any of the incidents that Del Galdo inquired with her about or that those incidents did not occur.

106.   Mr. Mseeh also testified at the Hearing. He testified that the police were only present at the Property approximately ten (10) to twelve (12) times per year.

107.   On February 20, 2024, Kasper issued a recommendation under Case No. 2023 BL 10 to revoke Plaintiff's Business License. (The "Business Recommendation" attached as Exhibit D).

108.   On February 20, 2024, Kasper also issued a recommendation under Case No. 2023

LL 10 to revoke Plaintiff's Liquor License. (The "Liquor Recommendation" attached as Exhibit E).

109.    Upon information and belief, Henyard never delegated her authority as the Local Liquor Commissioner to Kasper.

110.    The Liquor Recommendation and the Business Recommendation are identical (collectively referred to as the "Recommendation").

111.    Although the Recommendation did not reference the testimony of Clark or Gilhooly, Kasper stated that "[t]he officers' testimony was consistent and uncontradicted." (*Id*. at p. 8.)

112.    Mr. Mseeh's testimony and Clark's testimony both contradicted the testimony of the Testifying Officers.

113.    Kasper found Mr. Mseeh "not credible" for the sole reason that Mr. Mseeh's testimony was "in stark contrast to the officers' testimony and the allegations in Paragraph 32 in the [Charge]…" (*Id*. at pp. 8-9.)

114.    In other words, Kasper would not find Mr. Mseeh credible unless he testified consistent with the Charge.

115.    Kasper further held that "[t]he description of the other businesses in the strip mall supports the finding that the parking lot incidents, particularly the late night fights and shootings, were related to [Plaintiff] and not the other businesses that had closed hours earlier." (*Id*. at p. 10.)

116.    Upon information and belief, the Testifying Officers did not lay any foundation, and certainly did not present any documents, that established the time any of the alleged incidents occurred to support the inference that Plaintiff was the only party that could have been responsible for what occurred in a parking lot shared by several commercial businesses.

117. Kasper concluded that, in order for Mr. Mseeh's testimony to be credible, "the Hearing Officer would have to conclude the Village, and each of the testifying officers, had completely fabricated much of the allegations against [Plaintiff]." (*Id.* at p. 10.)

118. Upon information and belief, Kasper knew that the Village, and each of the Testifying Officers, had completely fabricated the allegations against Plaintiff.

119. The Village Board meeting scheduled for February 19, 2024, was cancelled and the Village Board, therefore, did not vote on the Business Recommendation.

120. Upon information and belief, the Village Board would have voted against the Business Recommendation by a vote of four (4) to three (3).

121. It is commonly understood that certain Village Trustees are loyal to Henyard, and the other four (4) are adamantly opposed to her agenda and the actions taken by her as Mayor more generally.

122. No vote was taken on the Business Recommendation on February 19, 2024.

123. DPD Officers often sit in the parking lot of the Dunkin Donuts, located directly across the street from Plaintiff, so that those officers can monitor the Property.

124. DPD Officers were in the Dunkin Donuts parking lot watching the Property on February 19, 2024.

125. On February 19, 2024, FOX Chicago visited Plaintiff at the Property to inquire about allegations that Plaintiff's Licenses were being held up for political reasons.

126. On the same night of February 19, 2024, FOX Chicago broke the story that agents from the Federal Bureau of Investigation have questioned at least a half dozen people, including business owners, a former Dolton employee, and an elected official as part of an investigation into Henyard.

127. On February 20, 2024, the same FOX Chicago reporter drove to visit the Property again and was followed there by DPD Officers.

128. On February 20, 2024, Lacey and other DPD Officers arrived at the Property after following FOX Chicago to the Property and gave Mr. Mseeh a "Findings of Fact and Order" for Case No. 2023 LL 10 (the "Revocation Order"). (Revocation Order attached as Exhibit F).

129. Lacey stated to Mr. Mseeh that, if he (Mr. Mseeh) did not sign Revocation Order, then he would be arrested.

130. The Revocation Order was signed by Henyard, and purports to authorize revocation pursuant to Village Code 3-3-17.

131. Village Code 3-3-17 reads:

3-3-17: **REVOCATION OF LICENSE; APPEALS:** The President, as Liquor Control Commissioner, shall have the authority to revoke any license issued pursuant to this Chapter for any violation of any provision hereof, or for any misrepresentation of any material facts set forth in the application for the license, or for the violation of any State or Federal law or Village ordinance pertaining to the sale of alcoholic liquor. (1971 Code ch. 74, §19)

In the event an appeal is taken from the action of the Liquor Control Commissioner, such appeal shall be limited to a review of the official record of the proceedings before the Liquor Control Commissioner. (Ord., 2-18-75)

132. The Revocation Order attached the Liquor Recommendation as "Exhibit 1" and cited the Liquor Recommendation (issued pursuant to a hearing that was held before Kasper and *not* the Local Liquor Commissioner) as the sole basis for Henyard's decision.

133. DPD further placed an orange closure sticker on the front door of the Property.

134. Lacey stated to Mr. Mseeh that he would be arrested if anyone removed the sticker.

135. As of the date of filing this Second Amended Complaint, no formal vote has been taken by the Board regarding the Recommendation.

136. The Revocation Order does not provide for any appeal rights or provide any

information as to how Plaintiff could appeal the Revocation Order.

137.     In addition, the Village does not circulate or make publicly available the Village Ordinance, and business owners in the Village are not provided with a copy of the Village Ordinance.

138.     Moreover, upon information and belief, Freedom of Information Act Requests to the Village seeking information, including information as basic as the Village Code, are customarily roundly ignored.

139.     According to the Village Code, the Village may not revoke licenses, or shut down properties for lack of the same, without first receiving approval from the Village Board. However, here, during the relevant time period, the Village Board took no action and allowed Henyard to revoke licenses and shut down businesses notwithstanding the Village Code which purports to grant the Village Board a measure of authority in that regard.

140.     Moreover, despite whatever "authority" the Village Board theoretically had with respect to *revoking licenses or shutting down businesses for lack of the same* under the Village Code, the same was not true with respect to approving license applications and issuing licenses, or failing to renew licenses.

141.     Plaintiff's business was interrupted and damaged based on the above actions and allegations.

142.     Plaintiff was left without a remedy to obtain its Business License or challenge the Revocation Order without any type of administrative process to challenge the actions of Henyard and the Village.

*Widespread Practice*

143.     Henyard has a pattern and practice of using her position as Mayor and Local Liquor

18

Commissioner to retaliate against her political rivals and/or businesses and/or individuals who did not contribute to her charity or campaign. The reasonable public perception of Henyard is that she misuses her office to retaliate against her political opponents and/or businesses that do not, or will not, support her.

144.     Henyard is a defendant in several lawsuits where she is alleged to have engaged in abuse of power and corruption. Henyard's saga as Mayor of Dolton has been widely covered in the news media, and on social media.

145.     For example, one Dolton small business filed a lawsuit against Henyard alleging that Henyard violated the plaintiff's constitutional rights by refusing to renew its liquor license. (*See* generally, *Lacey's Place, LLC v. Village of Dolton*, et. al., 2023 CH 07019 (Cook County, Chancery Division).

146.     The complaint in that case alleges, among other things, "[u]pon information and belief, the underlying reason for the Village's refusal to renew Lacey's Place's liquor license is due to the Mayor of Dolton's refusal to renew licenses to establishments who did not support or contribute to her political campaign."

147.     On November 27, 2023, it was reported that a Village board meeting "erupt[ed] into chaos amid allegations of misspending and harassment" by Henyard. Residents at the meeting stated that Henyard repeatedly harassed them for not supporting her, revoked their business licenses, and used the police force to do her bidding.

148.     Upon information and belief, since 2021 at least three other Dolton establishments have had their licenses delayed, suspended, or revoked without Board approval after failing to donate to Henyard's campaign or after criticizing her administration, or being deemed to be a political rival, including but not limited to Wilma's Famous BBQ a/k/a Wilma's Food Group (*see*

*Wilma's Food Group Inc. d/b/a Wilma's Famous BBQ v. Henyard, et al.*, Case No. 25 cv 4432 (N.D. Ill.)) and TAK Group Investments (*TAK Group Investments, LLC v. Henyard, et al.*, Case No. 2024 CH 9044 (Cook County, Chancery Division).

*Henyard as Final Decisionmaker*

149.    At all times relevant, the Henyard served as the Village's final policymaker regarding issuance, renewal, and revocation of liquor licenses under Village Code §§ 3-3-7 and 3-3-17. The Mayor's decisions in these matters constitute official policy of the Village.

150.    Under Village Code §§ 3-3-7 and 3-3-17, Henyard as the Mayor and as Local Liquor Commissioner exercises final and unreviewable policymaking authority over issuance, nonrenewal, and revocation of liquor licenses.

151.    As Local Liquor Commissioner, Henyard did not require approval of the Village Board to revoke Plaintiff's Liquor License, and only the Local Liquor Commissioner – not the Village Board – has the authority to sign and issue liquor licenses.

152.    Regarding Plaintiff's Business License, the Village Board knew of Henyard's misuse of licensing powers but took no corrective action against her and thereby ratified her conduct.

153.    The Village Board never placed on the agenda or held a vote to consider Henyard's revocation of Plaintiff's Business License during the relevant period.

154.    Despite repeated public complaints and news reports regarding the Mayor's retaliatory use of licensing authority, the Village Board took no disciplinary or corrective action.

155.    The Village engaged in a common practice of closing businesses without Board approval where the Village failed to act on license renewal applications and acted completely contrary to the Village Code.

156. Here, the Village, based on the established and accepted policy that all license renewal applications would remain "pending" until Henyard authorized approval, effectively revoked Plaintiff's Business License and Liquor License without due process.

157. Based on that policy, the Village failed to act on Plaintiff's renewal applications and caused them to remain "pending" indefinitely, closed Plaintiff's business based on the renewal applications status as still "pending," and failed to hold a meeting to allow the Village Board to vote on the Recommendations.

158. Plaintiff was left without any appeal or other challenge rights while its renewal applications were "pending" and before the Village Board voted on the Recommendations. As such, the Village *de facto* revoked Plaintiff's Licenses by causing them to remain indefinitely "pending" and depriving Plaintiff of any appeal rights to challenge Henyard's decision.

159. On August 7, 2024, the Illinois Liquor Control Commission ordered Henyard to renew Plaintiff's Dolton retail Liquor License. (*See* Exhibit G).

160. Henyard failed to comply with the ILCC order to sign and issue a liquor license to Plaintiff.

161. Ultimately, counsel for certain Village Trustees moved the court in case captioned *Jason House, et al. v. Tiffany Henyard, et al.*, Case No. 2023 CH 10204 (Cook County, Chancery Division) (J. Cohen) to award injunctive relief related to Plaintiff's Liquor License. On February 24, 2025, Judge Neil Cohen granted the motion and ordered that: (1) Defendant Henyard's inaction on items requiring action of the Mayor pursuant to state statute and Village Code, are "defacto vetoes" by Defendant Henyard; (2) the Board of Trustees shall place Pablo's Café's liquor license on the next Village Board meeting agenda to override Mayor Henyard's failure to sign said liquor license; and (3) any future failures by Mayor Henyard to perform her duties and obligations as

Mayor pursuant to state statute and Village Code shall be brought to the attention of this Court and if deemed a "defacto veto" by Mayor Henyard, then the Board of Trustees shall place subsequent defacto veto item(s) on the following upcoming Board meeting agenda for the Board to override said [] veto.

162.    Following that order, Henyard continued to refuse to sign or issue Plaintiff's Liquor License.

163.    On September 18, 2024, the court in *House, et al. v. Henyard, et al.*, entered a preliminary injunction declaring Trustee House as the Mayor Pro Tem and authorizing him to sign checks for payments that had been approved by the Village Corporate Authorities.

164.    On February 18, 2025, certain Village Trustees moved the court in *House, et al. v. Henyard, et al*., to expand the prior preliminary injunctive order entered on September 9, 2024 to "allow the Mayor Pro Tem to sign liquor licenses Mayor Henyard refuses to sign". In support of that motion, the plaintiffs (who are represented by the Village's counsel in this case) stated, "[s]ince the entry of the Court's Preliminary Injunction Order [entered September 18, 2024], [Henyard] has continued to refuse to perform her duties as Mayor and Local Liquor Commissioner, leading to additional litigation and unnecessary costs incurred by the Village."

165.    In other words, because Henyard's signature was *required* in order for liquor licenses to issue, Henyard was effectively and undisputedly the final decisionmaker.

*Series of Acts*

166.    As alleged throughout, Henyard, in her capacity as the Village Mayor, engaged in a pattern or practice of (1) revoking and/or non-renewing business and/or liquor licenses of several of her constituents that failed to donate to her political campaign or who she deemed to be political rival, (2) of giving those licenses to her supporters and/or associates, such as Kamal Woods, and

(3) that Henyard directed DPD, on several occasions, to close Plaintiff's business without the legal authority to do so.

## COUNT I
## 42 U.S.C § 1983 – Violation of Due Process
### (Plaintiff Against All Defendants)

167.    Plaintiff restates and realleges by reference paragraphs 1 through 166 as if fully set forth herein.

168.    A license to do business can constitute a property interest.

169.    A liquor license constitutes a property interest.

170.    A refusal to renew a business license is effectively a deprivation of a liquor license, because a local business cannot be eligible for a liquor license without a valid business license. Upon information and belief, the Illinois Liquor Control Commission has recognized this concept and conclusion, and has accepted appeals where municipalities have failed to renew a business license because that failure effectively serves as a non-renewal and/or revocation of a liquor license.

171.    Plaintiff's property interest has been deprived without proper due process.

172.    Such action of the Defendants violates Plaintiff's Fourth Amendment rights as protected by 42 U.S.C. § 1983.

173.    The Village and Henyard have deprived Plaintiff of its due process rights by denying Plaintiff access to a meaningful administrative procedures and hearing process since the Village allowed Henyard to install employees and attorneys loyal to her who would carry out her directives and edicts without question or protest.

174.    The alleged collusion between Del Galdo, Kasper and Henyard rendered the licensing and disciplinary process that was Plaintiff was afforded unconstitutional.

175.     The Village and Henyard have deprived Plaintiff of its due process rights by refusing or otherwise failing to act on Plaintiff's renewal applications and leaving those applications "pending" in order to manufacture a reason to close Plaintiff's business.

176.     The Village and Henyard have deprived Plaintiff of its due process rights by shutting Plaintiff down and constructively revoking Plaintiff's Licenses.

177.     Based on the Village's accepted practice of permitting Henyard to dictate all final licensing decisions and her position as the Local Liquor Commissioner, the Village refused or otherwise failed to renew Plaintiff's Business License and Liquor License for months without any reasonable basis and without an administrative hearing or decision regarding Plaintiff's Liquor License.

178.     The DPD shut Plaintiff's business down. The DPD stated to Plaintiff's representative that if it attempted to reopen, the DPD would shut it down again. At all times Plaintiff was closed, it remained so based on threat of police intervention, arrest and fine, as well as the threat that a license would not issue to allow Plaintiff to operate if it reopened.

179.     Defendants have caused Plaintiff damage to its reputation, lost business, lost income and sales, lost profits, inconvenience, future pecuniary losses, the loss of its Licenses, the loss of the use of its State License and Gaming License and other compensatory and consequential damages.

180.     Defendants' actions have tarnished, and continue to irreparably tarnish, Plaintiff's business reputation and goodwill.

181.     Defendants' actions were intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

182.     Defendants' actions were knowing, willful, and callous and/or in reckless disregard

of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

**WHEREFORE** Plaintiff respectfully requests that this Court:

A. Enter an order finding the Village and Henyard, in her capacity as Mayor and Liquor Control Commissioner of the Village, deprived Plaintiff of its due process rights in violation of 42 U.S.C. § 1983 by interfering with Plaintiff's business and operations by refusing to renew its Licenses for no coherent reason, issuing the Revocation Order before holding an administrative hearing in front of the Local Liquor Control Commissioner, fabricating testimony and evidence against Plaintiff, and closing Plaintiff's business before the exhaustion of judicial review procedures under the Administrative Review Law have occurred;

B. Enter a declaratory order that the Village's licensing policy is unconstitutional;

C. Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988;

D. Compensatory and consequential damages, including but not limited to, lost profits and loss of goodwill;

E. Punitive damages; and,

F. Any further relief as justice may require.

**COUNT II**
**<u>42 U.S.C. § 1983 – Violation of First Amendment</u>**
**(Plaintiff Against All Defendants)**

183. Plaintiff restates and realleges by reference paragraphs 1 through 166 as if fully set forth herein.

184. Plaintiff exercised its rights to free speech and political association by speaking out against Henyard to FOX Chicago on February 19, 2024.

185. On February 19, 2024, DPD officers followed FOX Chicago to the Property, at which time DPD Lacey gave Plaintiff the Revocation Order.

186. The Revocation Order was retaliatory in that there was no rational basis for revoking Plaintiff's Liquor License without a notice of hearing or hearing in front of the Local Liquor Control Commissioner, other than the fact Plaintiff's principal spoke with FOX Chicago

the day prior.

187. Henyard's actions were intentional, willful, and malicious and/or in reckless disregard of Plaintiffs' rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

188. Defendants, under the color of ordinance, regulation, customs, or usage, have subjected Plaintiffs to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, and pursuant to 42 U.S.C. § 1983, are liable to Plaintiffs in an action at law and equity, and under 42 U.S.C. § 1988 are liable for Plaintiffs' attorney's fees and costs.

**WHEREFORE** Plaintiff prays that judgment be entered in its favor and against Defendants on Count II and that the Court enter an order awarding Plaintiff: (1) compensatory and consequential damages, including but not limited to, lost profits and loss of goodwill; (2) attorney's fees and costs; (3) punitive damages; and (4) such other relief as the Court deems just and equitable.

### COUNT III
### 42 U.S.C. § 1983 – Municipal Liability (Monell)
### (Plaintiff Against the Village)

189. Plaintiff restates and realleges by reference paragraphs 1 through 166 as if fully set forth herein.

190. The Village, through its final decisionmaker with policy making authority, Henyard, adopted and implemented a policy of using license revocations and license renewal inaction to punish protected speech critical of Village officials.

191. The constitutional deprivations described throughout were caused by the Village's official policies, practices, or customs, including: (a) delegating final authority over licensing decisions to Henyard; (b) maintaining a pattern or practice of using licensing powers to retaliate

against political opponents and suppress protected speech; and/or (c) ratifying Henyard's misuse of such powers through conscious inaction despite notice of repeated misconduct.

192.     These policies, customs, and deliberate indifference were the moving force behind the violations of Plaintiff's constitutional rights.

**WHEREFORE** Plaintiff prays that judgment be entered in its favor and against Defendants on Count III and that the Court enter an order awarding Plaintiff: (1) compensatory and consequential damages, including but not limited to lost profits and loss of goodwill; (2) attorney's fees and costs; (3) punitive damages; and (4) such other relief as the Court deems just and equitable.

Respectfully Submitted,

By:      *s/Alex Kosyla*
One of Plaintiff's Attorneys

Daniel T. Fahner
daniel.fahner@rkfglobal.com
Alex Kosyla
alex.kosyla@rkfglobal.com
Fahner Rosenberg PLLC
d/b/a RKF Global PLLC
555 Skokie Blvd., Suite 450
Northbrook, Illinois 60062
Tel: 312-888-2000